308 Ga. 847
FINAL COPY

S20A0185.  SHEALEY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Dextreion Shealey and his co-defendant Kelvin Hurston were found guilty of felony murder and other crimes in connection with the gang-related shooting death of Daven Tucker. Appellant's only contention in this appeal is that the trial court abused its discretion by excluding from evidence statements that his co-indictee Charles Lovelace made during Lovelace's guilty plea hearing. Seeing no error, we affirm.[1]

---

[1] Tucker was killed on December 17, 2016. On March 16, 2017, a Troup County grand jury indicted Appellant, Hurston, Lovelace, Shawndarious Sands, Coty Green, Natori Lee, Dantavious Rutledge, Zachary Holloway, and Andre Gilliam for a series of allegedly gang-related crimes. Green, Lee, Rutledge, Holloway, and Gilliam pled guilty. On April 10, 2018, Appellant, Hurston, Lovelace, and Sands were reindicted, individually and as parties, for felony murder based on aggravated assault, aggravated assault, and participating in criminal street gang activity under OCGA § 16-15-4 (a). Appellant, Lovelace, and Sands were also indicted for a gang-related count under OCGA § 16-15-4 (b). Hurston, Lovelace, and Sands were indicted for one count each of possession of a firearm during the commission of a felony and for various crimes related to a shooting at a Troup County park earlier on the night of the murder.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the evening of December 17, 2016, Appellant, Hurston, Lovelace, Shawndarious Sands, Coty Green, Natori Lee, Lee's brother Kouri, Dantavious Rutledge, Zachary Holloway, Andre Gilliam, and Essence Todd — all of whom were connected to a criminal street gang from West Point called "4way" — attended a memorial celebration for a friend who had died.[2] After the memorial, the group and a few other people decided to go to LaGrange. They drove there in a caravan of cars that included among others Appellant's Ford

---

Lovelace and Sands then pled guilty, and Appellant and Hurston were tried together beginning on April 16, 2018. Green, Lee, Rutledge, Holloway, and Gilliam all testified for the State. On April 23, the jury found Appellant not guilty of violating OCGA § 16-15-4 (b) but guilty of felony murder, aggravated assault, and the gang activity count under OCGA § 16-15-4 (a); the jury found Hurston guilty of all charges against him. The trial court sentenced Appellant to serve life in prison for murder and 20 concurrent years for the gang activity conviction; the aggravated assault count merged. Without filing a motion for new trial, Appellant filed a timely notice of appeal, and the case was docketed to this Court's term beginning in December 2019 and submitted for decision on the briefs. The record does not show what happened to Hurston's case after trial; no appeal by him has come to this Court.

[2] The State presented testimony from Kouri (whose case was adjudicated in juvenile court) and an expert on gangs, as well as photos and video recordings, to establish that 4way was a gang, that all of these individuals were members of or associated with the gang, and that Appellant was a member.

Mustang, Green's Honda Accord, and Todd's Hyundai Sonata.

Appellant and a few others in the caravan stopped at a jail in LaGrange to put money in an inmate's account and then at a gas station before proceeding to a nearby public housing complex. A surveillance video recording of the complex's parking lot showed that Appellant's Mustang and the other cars in the caravan were at the complex from 9:53 to 9:59 p.m.

According to Green, there was an ongoing "beef" between 4way and a LaGrange group called "Mob," and the people in the caravan decided to drive to Granger Park to see if any Mob associates were hanging out there. Surveillance video recordings from the park showed that at 10:03 p.m., Appellant's Mustang and the rest of the caravan of cars entered a parking lot where dozens of people had gathered. According to several witnesses who were in the park, gunshots rang out from some of the cars in the caravan. One of those witnesses heard return fire from some of the people in the parking lot; several people in the caravan, however, testified that the people in the parking lot began shooting first. The park surveillance video

showed that the caravan left as people in the parking lot ran away. Investigators later found 39 shell casings in the parking lot. Remarkably, no one was injured during the shooting.

The surveillance video from the housing complex showed that at 10:07 p.m., Appellant's Mustang and the rest of the caravan returned to the parking lot there. Appellant's Mustang had a bullet hole in the passenger door, and according to several members of the caravan, Appellant was angry because his car had been hit.

According to Kouri, he received information that Mob members had shot at the caravan. He relayed that information to the group at the housing complex, and Green said that he knew the location of a house where some Mob members lived. According to Lee, Appellant suggested that they go to the house, which was on Newnan Street, saying that he "wanted some get back." Green testified that Appellant said, "Somebody's got to pay. My car just got shot," and "What y'all want to do? Somebody's got to get it." Green explained that he, Appellant, Hurston, Lovelace, Sands, Lee, and Kouri planned to shoot up Daven Tucker's house — the house on

Newnan Street — because Tucker was a member of Mob.[3] Appellant told another caravan member to drive Appellant's Mustang back to West Point, and Gilliam, Todd, and other people in the caravan then drove back there. Appellant got in the Accord with Green, Lovelace, Lee, and Kouri, while Hurston, Sands, Rutledge, and Holloway got in the Sonata. Kouri testified that everyone who got in the Accord and the Sonata knew about the plan to shoot up Tucker's house; Lee also testified that he, Appellant, Green, and Lovelace knew about the plan.

Green and Lee testified that on the way to Newnan Street, Green pulled the Accord over so that he could switch from the driver's seat to the passenger's seat because he "wanted to be a shooter." According to Green, Appellant also planned to shoot, but while they were in the Accord, Lovelace took a gun that Appellant was holding and said, "No, you're going to school. Let me take care

---

[3] In addition, Kouri testified that Green and Lovelace discussed "retaliation" and that the plan was to shoot up the house. Holloway also testified that the plan was to "go shoot somebody up" for "[r]etaliation," and Rutledge and Todd testified that there was discussion about "retaliation."

of that for you."[4]

The Accord and the Sonata were parked near Newnan Street, and Hurston, Green, Lovelace, and Sands got out of the cars. Hurston had a big, black handgun; Green had a .40-caliber gun; Lovelace carried a nine-millimeter gun or a .380 pistol, and Sands carried a nine-millimeter gun. Green testified that he, Hurston, Lovelace, and Sands started shooting toward the house; Green shot once and then got back in the Accord as the three other men continued to shoot. Green and Lee heard return gunfire from the direction of the house.[5] Lovelace then got back in the Accord; Hurston and Sands got in the Sonata; and both cars fled.

Tucker, who had been in the front yard of his house, was shot once in his chest. Emergency responders arrived minutes later, around 11:00 p.m., and took Tucker to a hospital, where he soon died

---

[4] Kouri also testified that Lovelace said that Appellant did not need to shoot because he was going to college. Kouri claimed that Appellant did not have a gun, but when he was asked by Lovelace to retrieve a gun from under one of the car seats and give it to Lovelace, Appellant did so. Lee testified that Lovelace told Appellant, "You're going back to school. I'll do it," that Appellant never held a gun, and that Appellant did not give Lovelace a gun.

[5] Lee, Kouri, Rutledge, and Holloway, who had stayed in the cars along with Appellant, testified that they heard gunshots but did not see who shot.

from the gunshot wound. Investigators later found 34 nine-millimeter shell casings, five .380 shell casings, and one .40-caliber shell casing at the scene.

The nine 4way members and associates in the Accord and Sonata all eventually went to a motel in Alabama.[6] Green, Lovelace, and Kouri were arrested there the next day, December 18.[7] In Green's Accord, investigators found Green's .40-caliber gun, an empty box for nine-millimeter bullets, a nine-millimeter bullet, and a plastic tray used to hold ammunition.

Appellant and Hurston did not testify at their trial. Appellant's theory of defense was that he was merely present in Green's Accord when other members of the group shot toward Tucker.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance

---

[6] Lee and Kouri, as well as Todd and another caravan member (who both met the others at the motel), testified that Appellant was at the motel that night. Holloway testified that he did not see Appellant at the motel.

[7] Lee was arrested on December 20; Rutledge was arrested on December 22; Hurston and Holloway were arrested about two months later. The record does not specify when Appellant and Sands were arrested.

with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

We note in particular that a person who does not directly commit a crime may nevertheless be convicted as a party to that crime. OCGA § 16-2-20 (a) says that anyone "concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime[,]" and OCGA § 16-2-20 (b) explains that a person is "concerned in the commission of a crime" if he, among other things, "[i]ntentionally aids or abets" the commission of the crime or "[i]ntentionally advises, encourages,

hires, counsels, or procures" another person to commit the crime. And while mere presence at the crime scene is insufficient to make someone a party to the crime, "'[a] jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes.'" *Carter v. State*, 308 Ga. __, __ (__ SE2d __) (2020) (citation omitted). In this case, although the evidence indicated that Appellant did not shoot Tucker, there was ample evidence from which the jury could find that Appellant aided, abetted, and encouraged the crimes and that he shared a common criminal intent with his 4way colleagues who did shoot at and kill Tucker, making Appellant guilty rather than merely present when the crimes occurred. See, e.g., *Williams v. State*, 307 Ga. 689, 690-691 (838 SE2d 314) (2020) (explaining that the evidence presented at trial was legally sufficient to prove that the appellant, who did not shoot the victim, was guilty as a party to the murder and not merely present at the crime scene).

2. Appellant's only contention is that the trial court abused its discretion by excluding from evidence statements Lovelace made

during his guilty plea hearing. We disagree.

(a) After the State rested its case-in-chief, the trial court asked Appellant's counsel outside the presence of the jury if the defense was going to put on a case. Counsel replied that it depended on whether Lovelace would testify. Lovelace, who had pled guilty but had not yet been sentenced, was then brought into the courtroom, where he told the court that he did not wish to testify and wanted to assert his privilege against self-incrimination under the Fifth Amendment to the United States Constitution. The trial court ruled that Lovelace was therefore "unavailable" as a witness.

Appellant's counsel then proffered that during Lovelace's guilty plea hearing, the prosecutor asked, "Is it truthful that [Appellant] was present in the car?" and Lovelace testified, "Yes." Counsel also proffered that during the plea hearing, the prosecutor asked Lovelace, "Is it my understanding that your testimony would be that [Appellant] was there but he wasn't shooting a gun at Newnan Street?" Counsel argued that those portions of the plea-hearing transcript would support Appellant's "mere presence"

defense. Counsel acknowledged that Lovelace's plea-hearing statements were hearsay, but argued that the statements were admissible under OCGA § 24-8-804 (b) (1), the prior-testimony exception to the hearsay rule.[8] In response, the prosecutor argued that the statements did not come within the prior-testimony exception because he did not have an opportunity and similar motive to develop Lovelace's testimony at the plea hearing, as he "was only doing enough to create a record" for the guilty pleas, not seeking to cross-examine Lovelace.

The trial court then ruled that the statements were not admissible under the prior-testimony exception, noting that the purpose of the prosecutor's questioning Lovelace at the plea hearing was simply "to get the plea done." The court also found that the evidence that Appellant's counsel was attempting to introduce through Lovelace's plea-hearing statements had already been presented to the jury "in other ways."

---

[8] Counsel also asserted that the statements were admissible under another exception to the hearsay rule, but Appellant does not raise that argument on appeal.

(b) Appellant correctly recognizes that the statements Lovelace made during his plea hearing are hearsay. See OCGA § 24-8-801 (c) (defining "[h]earsay" as an out-of-court statement that a party offers into evidence "to prove the truth of the matter asserted" in the statement). See also OCGA § 24-8-802 ("Hearsay shall not be admissible except as provided by this article [of the Evidence Code] . . . ."). Appellant maintains, however, that the statements come within the prior-testimony exception to the hearsay rule, OCGA § 24-8-804 (b) (1), which says in pertinent part:

> (b) The following shall not be excluded by the hearsay rule if the declarant is unavailable as a witness:
> (1) Testimony given as a witness at another hearing of the same or a different proceeding . . . , if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. . . .

As both parties acknowledge, Lovelace's invocation of his Fifth Amendment privilege against compelled self-incrimination, once accepted by the trial court, made him "unavailable as a witness." See OCGA § 24-8-804 (a) (1) (explaining that a hearsay declarant is 'unavailable as a witness' if he "[i]s exempted by ruling of the court

on the ground of privilege from testifying concerning the subject matter of the declarant's statement"). See also *Mitchell v. United States*, 526 U.S. 314, 326 (119 SCt 1307, 143 LE2d 424) (1999) (holding that a defendant's Fifth Amendment privilege against self-incrimination is not extinguished by the entry of a guilty plea but rather may be asserted at least until sentencing). The parties also correctly agree that Lovelace's plea-hearing statements qualify as "[t]estimony given [by him] at another hearing of the same or a different proceeding[.]" OCGA § 24-8-804 (b) (1). Thus, the issue in this case is whether the State — the party against whom Lovelace's prior testimony was offered at Appellant's trial — had "an opportunity and similar motive" to develop Lovelace's testimony at his plea hearing. Id. We will assume without deciding that the State had an opportunity to develop Lovelace's testimony at the plea hearing, because we conclude that the State did not have a similar motive to do so.

OCGA § 24-8-804 (b) (1) is materially identical to Federal Rule of Evidence 804 (b) (1). See *State v. Hamilton*, 308 Ga. 116, 121 (839

SE2d 560) (2020). We therefore look to the decisions of the federal appellate courts for guidance in construing and applying the rule. See id. And the federal appellate courts that have considered the similar-motive requirement in Federal Rule 804 (b) (1) under circumstances like the ones in this case have consistently held that the government does not have a similar motive to develop testimony at a co-defendant's plea hearing as it does at the appealing defendant's trial. See, e.g., *United States v. Oyorzaval-Vera*, 184 Fed. Appx. 398, 399 (5th Cir. 2006); *United States v. Preciado*, 336 F3d 739, 746 (8th Cir. 2003); *United States v. Jackson*, 335 F3d 170, 178 (2d Cir. 2003); *United States v. Powell*, 894 F2d 895, 901 (7th Cir. 1990); *United States v. Lowell*, 649 F2d 950, 965 (3d Cir. 1981).

The prosecutor's motive in questioning Lovelace at the plea hearing was to establish that Lovelace's guilty pleas were voluntarily entered and that there was a sufficient factual basis for them. See *Preciado*, 336 F3d at 746 (holding that the government did not have a similar motive to elicit a co-defendant's testimony at his plea hearing because "[t]he government's motive at [the] hearing

was to ensure that the plea was knowing, voluntary, and intelligent and that there was an adequate factual basis to accept it"); *Lowell*, 649 F2d at 965 (explaining that the government had "no similar motive or interest" to develop a co-defendant's testimony at his plea hearing because the government's "only motive . . . was to assure that the plea was voluntary and that a factual basis existed for the plea"). The prosecutor briefly examined Lovelace about who was present at the crime scene when he and others shot at Tucker, but the prosecutor had no need at the plea hearing to develop testimony specifically about Appellant. Indeed, the ultimate responsibility for ensuring that guilty pleas are voluntarily entered and factually supported lies with the judge, not the prosecutor. See Uniform Superior Court Rules 33.7, 33.8, and 33.9. See also *Powell*, 894 F2d at 901.

By contrast, if Lovelace had testified for the defense at Appellant's trial, the prosecutor's motive would have been to test Lovelace's credibility. The prosecutor would have been particularly interested in developing testimony about Appellant's interactions

with Lovelace and the other co-defendants before, during, and after the fatal shooting and attempting to discredit any testimony Lovelace might have given suggesting that Appellant was not a party to the murder. Thus, the State did not have a similar motive to develop Lovelace's testimony at his plea hearing as it had at Appellant's trial, and the trial court's ruling that Lovelace's plea-hearing statements were not admissible under OCGA § 24-8-804 (b) (1) was not an abuse of discretion.

Moreover, even if the plea-hearing statements had been admissible, any error in their exclusion was entirely harmless. As the trial court noted, Lovelace's proffered statements — that Appellant was present in the car with him at the crime scene but was not a shooter — were cumulative of properly admitted testimony from several witnesses at trial that Appellant was present in the Accord but did not shoot at Tucker. But those statements, like that testimony, did not prove that Appellant was not a *party* to the crimes. See, e.g., *Williams*, 307 Ga. at 690-691. Thus, it is highly probable that the exclusion of Lovelace's statements did not

contribute to the jury's guilty verdicts. See *Reaves v. State*, 292 Ga. 545, 548 (739 SE2d 368) (2013) (holding that the alleged erroneous exclusion of evidence was harmless because it was cumulative of other evidence admitted at trial).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 1, 2020.
Murder. Troup Superior Court. Before Judge Palmer.
*Jackie G. Patterson*, for appellant.
*John H. Cranford, Jr., District Attorney, John C. Winne, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.